All right, Mr. Glasser, I think we're ready to proceed. You reserve two minutes for rebuttal. Yes, your honor. If the court please. James Glasser on behalf of appellant Mr. Spear-Zuleta. I'm representing Mr. Spear-Zuleta pursuant to the Criminal Justice Act. With me at council table is my colleague, Mr. James Allison. This court has repeatedly and on numerous occasions indicated that a guilty plea is a grave and solemn act that should be accepted only with great care and discernment. The circuit requires strict and scrupulous compliance with the mandates of Rule 11 and examines critically even the slightest deviation from the rule. Juxtaposed against this requirement of strict compliance and the warning against even slight deficiencies is the district court's own assessment of the Rule 11 as found in its rulings denying various motions to withdraw guilty pleas. In the court's ruling, the court itself recognized that the Rule 11 colloquy in this case was riddled with ambiguity, special appendix at page 10 and confusion, special appendix at page 10 and more ambiguity at special appendix pages 12 and 19. Rule 11 in this case was fatally defective because the district court failed to both ensure that there was an adequate factual basis and failed to ensure that Mr. Spear-Zuleta fully understood, stood, pardon me, the nature of the charges against him. Now this court's decision in Blade I think is really determinative. Let me ask you, Mr. Glasser. Yes, Judge Bianco. Let's see if we can see what we agree on and don't agree on. You would agree that if a robbery targets someone in connection with drug trafficking under our case law, that would clearly satisfy the interstate commerce requirement. Is that- Under Taylor in this court's case is Lee. That's correct, Your Honor. And I know at the plea there was a back and forth about whether or not your client took proceeds of drug trafficking, either drugs or money that was proceeds or clothes that was proceeds. So I understand that's what you're referencing. But what I would like you to address is it appears to me that the government also proffered at the guilty plea that the purpose of the robbery was in connection with drug transactions and a drug debt. The purpose was to recoup a drug debt. And I didn't see anything at the guilty plea where counsel disputed that. It was all about my client doesn't agree that he took drugs or money. He just wanted to say clothes, and he wasn't willing potentially to concede that the clothes were purchased from drug proceeds. But what about the lack of any type of dispute about the underlying motive was to recoup a drug debt? Yeah, so I believe we addressed that in the briefing, Your Honor. In this court's decision in Adams, it's very particular. And that is that the review of the Rule 11 is done based on only issues raised at the time of plea. Well, no, no. What Adams says and what our cases say after Adams is the facts, although as the government pointed out, there's a case called Loyd that seems to suggest that you can gather facts after the guilty plea. Well, let's assume based upon Adams and those other cases, the facts have to be on the record at the time of the plea. Correct. That fact was on the record at the time of the plea. The district court, there is no requirement in this circuit that the district court articulate the legal theory at the time of the plea. If there's an issue later on, the district court can always look back at the plea and say, well, maybe there's no factual basis based upon fact A. But fact B satisfies it, that you don't get your guilty plea back if you allocate it or you don't dispute a fact that was on the record and can supply the same legal basis. That's my issue. Yeah, no, and I understand Judge Bianco, but I think actually the denials of the government's proffer was broader than just the particular items. The gun, the clothing, and everything else. Wait, where in the guilty plea does the lawyer, I read it over and over, suggest that the motive of the robbery was not to recoup its drug debt? Where did the lawyer say- It doesn't specifically deny that particular claim, but what the lawyer did do at the time of plea, and I take refuge and I take particular comfort in the fact that, and it's at page 77 of the joint appendix, Your Honor. He indicated, but as to each particular item outlined by the government, my client is not admitting to those. So at a minimum, there's ambiguity that's injected. And this court's cases in Gonzalez, Blackwell, and others say that a plea that's based on ambiguity is not a sufficient- The ambiguity is he doesn't want to admit that he took a gun. He doesn't want to admit that he took money. He's willing to only say, I took clothes, and he's not willing to say that he knew, although he doesn't need to know, that it was drug proceeds. But let's assume the best case scenario for your client, that he disputed that the clothes were the drug proceeds. There's nothing in there on page 77 and 78 that talks about the underlying motive as it relates to recouping a drug debt. No, you're right, Your Honor. There is nothing specifically that I think it was Attorney Boyle for the government to, outside of the proffer, put the background of the case on the record. There is nothing specifically in the record that contests that. But I think that the line that I just referred to was much broader than specifically recounting the gun or recounting, by the way, the gun which the court found wasn't there, other items. He specifically indicated, as to each item outlined by the government, my client is not admitting to that. I would respectfully submit to the court that that creates significant ambiguity in terms of what the defendant was indeed- He afterward goes into, he lists items, money, drugs, and so forth. And concedes about, gives a concession as to one item, which is clothing. So I read that to be talking about the things that were stolen, not the purpose of the theft. I think that's one interpretation, Judge Jacobs, that he did list several items. And in response, he says, as to each particular item, so that adjective, I suppose, or the term item, may be linked. But I think it would, pardon me, the students in the room should pay special attention to the correction. That particular could be linked back to the recitation of items. But I would respectfully submit to the court where there is ambiguity, such as there was here. Clearly, this individual was not admitting to being involved in the drug trafficking activity, was not being involved in taking proceeds of crime. You would view being involved in the drug dealing activity as an item? I certainly, as something that, an item that the government recited in its proffer, or a matter that the government recited in its proffer, to support a factual basis. The intent of the attorney representing Mr. Spears who led it at court, I think, was very clear, that he was admitting only the taking of the clothing. That's what he was admitting to, taking those by force and nothing else. And I think that's a fair reading of the record in this case. Let me ask you, your related argument about the explanation regarding the nature of the charges. I'm a little confused about that, because obviously, the jurisdictional, the interstate commerce element was discussed. Clearly, there was notice that that was one of the elements. And I don't, just your court cannot give jury instruction type explanations of each of the elements. How could that be insufficient in the case law? Well, under the case law, your honor, and this court's cases, including the Adams case, the Lloyd case, the Mahar case, and everything else, that just the court has an obligation, individually, to make sure that the defendant understands the nature of the charges. It entails, and you know this, going through the elements, doesn't entail explaining to the defendant, this is the way the government can satisfy this element, this is the way it can satisfy this element, which is, I think, the type of detail you're suggesting should have took place here, right? Well, I think that the court has to, and the Supreme Court's decision, in the Cray case, I think it is, indicates that the court really has to make sure the defendant understands the charges against him. And reciting the elements may be one way of doing that. In this case, the court didn't recite the elements, the government did. I haven't found a case that says that that's okay. I know it happens in cases, but there's no decision from this court that I've found that says that's okay. The cases do say that the court itself should undertake, and the rule says the court itself should undertake that searching inquiry to make sure the defendant understands not only the nature of the charges, but how the facts satisfy those charges. A careful reading of the plea colloquy in this case discloses there's not one instance where the district court judge asks, do you understand the charges against you? She asks, have you read the charges, or do you know what you're charged with? In my mind, somebody would ask me that question, do you know what you're charged with? Yeah, I'm charged with the Hobbs Act robbery. Not necessarily that I understand the Hobbs Act robbery and what the elements of the Hobbs Act robbery are. And let me just, if the court please, I know my time has run out, but if you allow me one minute, I can walk you through that. In the plea colloquy reveals that the court indicated that, asked the defendant whether he had read the plea agreement he indicated he did. The court said, I'm going to go over the plea agreement with you down the line. The court never did that, never came back to the plea agreement. The court asked, did you read the indictment? He said that he did. He was not ever asked, did you read the indictment and did you understand it? Or did you understand the charges against you? That's a joint appendix 51. He indicated that he had discussed the charge with his counsel, but he never indicated that as a product of that discussion, he understood the charges against him. He was asked the following compound question by the court, and this is at the joint appendix 64. He was asked, do you have any questions about what you are charged with? What the maximum penalties are? What rights you have and what rights you are giving up? Mr. Spears, who let up, answered no. Notably, he was not asked, do you understand what you're charged with? In this court's decision in Marr, the court indicated that the court may inform the defendant of the nature of the charge by describing the elements of the offense in the court's own words. Or the court may provide that information by reading the indictment to the defendant, where the pertinent count spell out the elements of the offense and the circumstances indicate that will be sufficient. And Lloyd's decision says, this rule, the rule- The government did that on page 74. They went through the various elements. The government went through the elements, your honor. The court did it. We said that the district court can satisfy this by asking the defendant to describe his participation in the offense. Requesting the government to describe the elements of the offense. So I think it may be the better practice for the judge to do it, but certainly if the government does it and it's accurate. I don't think there's a basis to undo the plate, right? Well, I would respectfully suggest to the court that there was no indication from Mr. Spears-Uletta. There was no discussion after the recitation of the elements of the offense whether he understood that. But hear from the government. Sure. Thank you, your honor. Good morning and may it please the court. Patrick Daugherty for the United States, the appellee in this matter. The robbery charge in this matter arose from a drug beef. The district court said as much. Mr. Spears-Uletta was sentenced to 135 months imprisonment after pleading guilty to a drug motivated Hobbs Act robbery that was committed in November of 2017. The sentence on that matter was procedurally reasonable. Spears-Uletta targeted his former associate, Alan Robertson, a drug dealer, and directed others to take items from Robinson's home to satisfy a drug debt. At the change of plea, the government proffered that Spears-Uletta directed the robbery and that it arose from a narcotics dispute, that's at Joint Appendix 74. The government also proffered that the items stolen constituted drug proceeds. In denying the defendant's first motion to withdraw his plea, the district court found that in the robbery, the items stolen were to enforce a drug debt related to drug trafficking, that's at Special Appendix 13. At sentencing, the district court found that the relationship between Spears-Uletta and Robinson was a drug relationship at Joint Appendix 372. The jurisdictional element is satisfied here, where, as was raised during council's comments, where a drug dealer is robbed and where items are taken, thus affecting illicit interstate commerce. Spears-Uletta now moves to vacate his guilty plea for the same three reasons that were denied by the district court. That the district court failed to determine the factual basis for the plea. That the district court failed to properly ensure that Spears-Uletta understood the nature of the charge to which he was pleading. And that the late disclosure of impeachment information after the change of plea, after it was ordered by the court to be turned over, was immaterial. That was the finding of the district court. With respect to, let me take a step back. Also with respect to point four, Spears-Uletta claims that there was clear error in the factual findings made by Judge Hall, resulting in the one level increase based after a factual hearing, where a witness testified that cocaine had been stolen from the drug motivated robbery. So starting with respect to point one, the factual basis for the guilty plea. The district court properly determined that there was a factual basis for the guilty plea. Understanding the difference between Lloyd and Adams. Under Lloyd, the district court can consider under rule 11B3, the entirety of the record of the evidence up until the time of judgment. Judge Hall did just that. She had the information at the time of the change of plea, the indictment, the plea agreement itself. The indictment, of course, being a speaking indictment that included the factual basis for the robbery. As well as the proffers by the attorneys and the admissions by the defendant at the change of plea. She also then had, before or later, the evidentiary hearing that provided her even more information to provide that factual basis. Other than Lloyd, there's a series of cases where you suggest that the facts have to be gathered at the time of the plea. Isn't that accurate? That's true, Your Honor. You may be able to pull from those facts later in making additional findings. But the idea that if you have an evidentiary hearing at sentencing, that could serve as the factual basis for the plea is not other than a possible suggestion that in the Lloyd case is not consistent with our case law, right? That's right, Your Honor. I think, however, Lloyd is more faithful to the rule where it's the court's determination. So of course, the court has an ongoing duty to ensure that there's a factual basis for the plea. So even, say, there's an evidentiary hearing later, the court needs to maintain or continue to understand or feel that there is a sufficient factual basis for the plea. So Lloyd is true to the rule B3, 11B3, as written. You would agree that it's inconsistent with Adams and other cases that have said otherwise. It is, Your Honor. And even operating under Adams at the time of the change of plea here, there wasn't both a sufficient factual basis for the guilty plea and a sufficient basis for the defendant's understanding of that plea. Again, the- I would like you to address Mr. Glasser's second point about failing to adequately explain to the defendant the charges. Can you address that point? Yes, Your Honor. Here, the district court has the ability to rely on profits by the government in the change of plea proceeding. And so here in the change of plea proceeding, the district court had before it the indictment, which again included speaking indictment, which had the factual basis for the underlying Hobbs Act robbery. That was before it, the defendant had read that, it was provided to him, he elicited that, he had read it. There also had the plea agreement, which had the factual basis for Hobbs Act robbery, of course. And then the government proffered the elements of the offense, the specific elements of Hobbs Act robbery. The taking, taking by force, and the jurisdictional argument. But then also went through the factual basis for the offense itself, which- Is it fair to infer that a person, a layman who has read a legal document, understands it? Not necessarily, Your Honor. I think here, there's more than that. You have the plea colloquy by Judge Hall after the government both goes through the elements of the crime and the factual basis of the crime. So again, what we're seeking that the defendant understand is that there was the elements of the crime, the taking, the taking by force, and then the resulting effect of commerce or affecting commerce. So here, that was satisfied because, again, though the indictment is typically in the plea agreement here was an elemental document, the indictment did have the facts that there's a drug relationship, that this is a drug motivated robbery. But then the factual proffers by the government also included that. And here where the issue is the jurisdictional argument that the defendant didn't understand or didn't have knowledge of the jurisdictional prong, he need not have knowledge of that. Here he's seeking to rob a drug dealer, and then the effects of that affect commerce. And David, do I understand your argument to be that if somebody in the subway pulls the necklace off somebody and that person turns out to be a drug dealer, that that's sufficient for jurisdiction? I think there, maybe not. But I think where you're targeting specifically a drug dealer or targeting specifically drug proceeds, your knowledge of whether or not that affects interstate commerce is, this court's held irrelevant, both, and I think Lee stands for this, but also the court in Silverio, in an instance where a residential burglary was committed, the individual committing that burglary is unaware that the object of the burglary was the business proceeds of a doctor. The court found, really, that the defendant's intent or his knowledge was irrelevant. So in this instance, you have, both based on the factual proffers, the documents, and really the entirety of the record, that a drug dealer is being targeted. And certainly infer that Mr. Spears-Zaleta knew that, but is also listed as part of the facts, that this was to settle a drug debt between the two. So the items that were being taken and the contestation of the specific items that were taken really are irrelevant because the motivation for the robbery was to affect illicit interstate commerce. I'd like you to address the impeachment material question, and I understand the argument about that it was immaterial, but I just want to make sure, with respect to what the law is and whether or not it's required to be disclosed. Because there's our case in Abileno, which says that withheld fable material can prevent a guilty plea from being known involuntary, but then the Supreme Court in Ruiz seemed to say impeachment material is different than Brady material for that purpose, and here we have impeachment material and not Brady. So I guess the question is, have we clearly decided after Ruiz, whether or not there is an obligation to disclose impeachment material before a guilty plea? I don't think it's been definitively decided. I know in Abileno, Abileno did stand for the proposition that, where there's a court order to turn over impeachment material. So here, we were close to trial. There was an order by the district court, by Judge Hall, to turn over the impeachment material. That regrettably did not happen, full stop. When it was found out that we had that, it was subsequently turned over, though that was after the change of plea. So I don't think that Ruiz stands for the notion that impeachment material, or Ruiz certainly does not stand for the notion that impeachment material must be turned over, or that it's material- Ruiz says the opposite. Ruiz suggests you don't have to turn it over. The question is, if a court sets a deadline and you fail to do it, does that take it outside of Ruiz, which- And I think it could, and I think Abileno, to that extent, does address that in some respect, where it notes that the fair and just reason standard is more generous, and that a failure still may be a basis to vacate a plea if that's material. But here, Judge Hall had the opportunity to assess that information in fulsomely, go through it, and make that determination that that was not material. So here- Material, in this instance, material to what? So here, the information was, in effect, that a witness, a primary witness in the case- Yeah, I understand. Yes. So- Witness protection, essentially. Correct. So to the credibility of this particular witness, which the government would argue was cumulative, as we saw at the evidentiary hearing where this witness- I understand that the issue is there's already more than enough disclosure to cross-examine that witness, but what is the materiality issue here? It's to whether this defendant would have pled guilty? Yes, Your Honor. It's to whether or not, had the defendant had that material, he would have not pled guilty and gone to trial. I think the record here- So that starts to resemble a harmlessness analysis, does it not? It does. So in this instance, it would be a de novo review, though great weight would be attributed to the trial judge's assessment with respect to materiality. But I agree where here, where it's a cumulative piece of information, and the district court was able to both go through and remedy what the proper approach was in the government's violation of its court order, but also determine that that information was, in effect, material and cumulative. I think that because of those determinations are there and are on the record, there's no need to vacate. All right, thank you. I see that my time's up. Mr. Glasser, you have two minutes in rebuttal. Thank you, Your Honor. Just very briefly, and I understand that we've been over this, but I just give the court a couple of citations. Mr. Spears, who led his position, is that he didn't acknowledge each and every element, and he specifically contested one element of the offense. And I just call to the court's attention its opinions in the Culpertson case, Gonzales, Adams, Blackwell cases, and specifically the Gonzales case, where the court is held, where the admissions to support a guilty plea is not ambiguous. That's a problem, it has to be unambiguous. And here, respectfully submit, there's ambiguity riddled within the change of plea hearing, as the district court herself recognized that there was ambiguity and confusion. Let me go to the issue, Judge Bianco, that you raised and just reply quickly to it. So I agree that the reading of Ruiz overrules Avellino and generally indicates that impeachment material is a trial right. Here, there's a difference though, and I think Judge Bianco, you focused in on it, and that there was an order here which distinguishes that from Ruiz. The context of Ruiz was a fast track program in California where defendants, in order to benefit from the fast track program, were required to execute a waiver. Obviously, nothing like that is present here. Here we've got not one order, but three orders. The District of Connecticut has a standing order on discovery, which requires that within 15 days of arraignment that the government produce not only Brady information and all of the 302s and reports, but also Giglio information. And then that's a continuing duty throughout the case as that develops. In this case, there was also two separate orders issued by Judge Hall. One that's found in the district court docket at entry number 47, which required that all Giglio information be produced by April 1 of 2019. A second order was issued by Judge Hall, docket number 124 in the district court docket. Mr. Glasser, even assuming all that, the question is, Judge Gig was focusing on what the government is. If your client learned that she had received some money because of issues regarding safety, that your client would have said, I'm going to trial, I'm not pleading guilty. What's the real likelihood of that? Well, I think that they, well, we'll never know, obviously, because he didn't have that information. If it was significant impeachment information, what I submit to the court, it was. The sequence of events here was that Ms. Branham was interviewed several times. First of all, she didn't report the robbery for five or six months. Then, sometime later, she was interviewed, she lied about it, she was interviewed again, she lied about it. Well, she was involved with the defendant, she was the most involved. I mean, you make it sound like, I mean, there are more facts to that than just- Certainly, there certainly are. So when the defendant's evaluating whether he would or would not want his plea back, the question is, she sought protection, and because she had rather difficult experience with him, right? Well, the government makes that argument, made that argument to Judge Hall. It's interesting, if you read the Fatico hearing, or excuse me, it was the sentencing transcript where Judge Hall, I think it was the lawyer representing Mr. Spears-Uletta, indicates I filed, it was in the discussion of the acceptance of responsibility credit. But Judge Hall's initial reaction when the lawyer said, I filed that motion to withdraw a plea, but I still think he should get credit for acceptance of responsibility, Judge Hall said, don't be hard on yourself. You should have filed that. When I first saw that disclosure of the Giglio information, I thought to myself, geez, we're back to the starting line here. We're going to have to start all over again, because it was significant. Again, that's in the sentencing transcript during the discussion of acceptance. So it's her kibitzing as opposed to her order that we look at? I'm sorry, Judge? It's her kibitzing as opposed to her order that we look at? I'm sorry, I- Well, she made an evaluation, didn't she? She did. So isn't that what we look at as opposed to her back and forth with regard to a lawyer? Well- Initially she may have been concerned about it, but then she looked at it and determined it wasn't material, right? Well, she looked at it in the context of Ruiz, right? The court cited Ruiz to her, and she said, look, I read that case, and she actually said that at the time of the sentencing proceeding. She said, well, the government educated me on the law. I didn't realize that Ruiz didn't require it. But there's a case, I believe we cited in our brief. It's the Supreme Court of Wisconsin, the Harris case, which is four square with the facts here, really, where there was a significant nondisclosure of Giglio information in that case. But there was a state statute that required that the Giglio information. And the Supreme Court of Wisconsin specifically distinguished Ruiz by saying, look, here I get it that there's this constitutional issue about whether it's a trial right or not, but here we have a state statute. Similarly, here we've got three court orders, which I think distinguishes this case from Ruiz and distinguishes the basis upon which Judge Hall found that it's not a significant constitutional violation. Thank you, Mr. Glasser. Thank you to the government. Thank you, your honors. We'll reserve decision. Have a good day. You too, thank you. Safe journey. Okay, the next case on the calendar is Levin-Hegna et al versus the United States. You're having to move again. Okay, and I see Ms. Smith, that you're going to go first. And you reserve one minute for rebuttal. You can begin whenever you're ready. Yes. Thank you, Honor. Good morning. Suzelle Smith representing the Levin's victims of Iranian state sponsored terrorism. I'm aware that the Second Circuit is no stranger to the NRA 650 case, which is 15 years old, I think. I know at least some of you have authored opinions. Four. Thank you. I'm not sure we're supposed to call anyone by name. That's all right. It's okay. Yes, and your honor, a number of those at least reverse procedural irregularities committed by the district court. And here we are again with another procedural irregularity. I know I have a short period of time, and I really want to focus on what I think the panel needs to focus on most directly. This case, and I've handled a number of collection cases under TRIA for 9-11 victims and the Levin's and others. In every other case that I have handled a TRIA collection matter, what the district court did was to bring all the claimants and the government and anyone in to the courtroom all together and let everybody sort out first the liability but also their relationships one to another priority claims. This one was different and I'm not re-arguing that. I was voted off the island and I've been trying to swim back ever since. But the Levin's have a separate claim, Levin versus Asa and have the main action in Ray 650. Now the district judge did let me, she gave me permission to come in to object to the forfeiture judgment in or on behalf of the government. So we had a different situation where I wasn't allowed to participate along the way to raise my objections. But I was allowed to come in at the end. The most important fact for this panel to consider in reviewing this case is that the Levin's have an existing, presently, currently existing 1610C FSIA writ. Which is attached to the assets which the district court is purporting to give to the government under the forfeiture action. That writ has never been dealt with. That writ has never been expunged or quashed or anything else. It is an existing writ that attaches to- When was that writ? That writ was issued, your honor, in 2016 before the judgment of 2017. Which was entered on behalf of the other judgment creditors. The terminology can get a little bit confusing. The Kirshenbaum judgment creditors got a judgment in 2017. The Levin's writ, 1610C writ, already existed. So whatever the judgment was that the judgment creditors got in 2017, and I've briefed all the things I think are a problem with that. But even if that judgment in 2017 is valid, our 1610C writ has never been expunged or dealt with. It is attached to those same assets. My question, one of my questions was how do you have standing at this point? We've already determined that your clients have no claim. We've already said they have no claim back in 2016. So it didn't appear to me you have statutory standing based upon that. But I think what you're suggesting to us is that the writ is creating the claim now? Did that happen after the determination? So two points, very important. What the second circuit held in the case that you're talking about, your honor. There were two cases, one where he said intervening was untimely and the claim was untimely. That's right. Weren't allowed to intervene, filed their own separate action. Tried to get into the forfeiture action as a claimant. And this panel said, you can't come in under forfeiture. Not relitigating that, we can't ask for any of the money in the forfeiture. But we are entitled to go after the assets, the blocked assets under TRIA. Which, by the way, the government didn't get a forfeiture first. The other Kirshenbaum judgment creditors got a judgment in 2017, subject to- You don't have a TRIA judgment, that's pending, right? Well, we have a judgment against Iran and a collection action which is pertinent to, which is the process that you go through to get your- Which is pending. And so the way that process works is, under state law and under federal law, that until the final resolution of all the claims, including the writ, which has to be dealt with, we have a preliminary levy to conserve property until the eventual execution. That's state law, that's federal law. You don't just get to ignore writs and say, oh, we have an existing writ. Guess what? We'll push the Levin's off until their own action. They have a writ on those assets, which the- All right, we'll see what the government says in response to that. I understand your argument, thanks. All right, we'll hear from Mr. DuPont. Good morning, your honor. Ralph DuPont, and I'm pleased to be given the opportunity to appear from home. And I hope we're getting through to you okay. Yep, we can hear you fine. All right, I just want to make two rather simple points here. My first problem is with the order that we have from Judge Prescott. That we are parties to an agreement that our contention is we are not parties to because of our failure to furnish a second parcel to the agreement, which was worked out after careful and complete opportunity to debate, decide on what we would like to have in the agreement. And we asked for an agreement which completely covered percentages that are shared by each of these numerous plaintiffs. We did not get it. We still don't have it. And there is just simply no agreement that was ever entered into. Unfortunately, however, Judge Prescott, looking at the agreement, saw upon it of my signature, the signatures of the rest of the folks, and it was a complete agreement in every respect. And why should she expect to have anything else? Well, she didn't because there was never a hearing. There was never an opportunity to bring these matters to her attention. There was a judgment that was handed down, I believe on May 17th, and that judgment just simply took it. But granted that there was a bar to our proceeding further, and now we were part of the other judgment's presence. I would respectfully ask the court's objection to that agreement because it's complete in every respect. We don't deny that. And that's the agreement we would like to see, except there is no second parcel. The second parcel would give us percentages for the Heckners and for the rest of the folks. And if those percentages were not in accordance with our instructions from our client, of course, we would never have released the agreement. Why is it signed? And why is it in the hands of anybody else? We have folks from San Francisco, I guess all the way up to the North Pole almost, in these proceedings. Where, Mr. DuPont, Mr. DuPont, this is Judge Wesley. Where in the agreement that appears at addendum one through five, it bears your signature, a signature purporting to be yours of September 29, 2017. Where in the agreement is there a requirement of the second parcel? The agreement to the second parcel, Your Honor, was handled by the convenor, one of the attorneys in this matter. And he was responsible for getting together the mediation procedures and also collecting a signed document because the court wanted one as soon as possible, as I understood it. And the second parcel could not be worked out because there was disagreement among the remaining judgment creditors. I was assured that that was not going to be long to satisfy, and I left my document with the convener. I don't know how the document even reached Judge Forrest because I never released it from the convener. Mr. DuPont, let me just ask you the same question I asked Ms. Smith. The, similarly to her client, in 2016, we affirmed that the dismissal of the forfeiture claims. So my question to you is, on what basis does your client have statutory standing at this point when we were already determined that their forfeiture claims were properly dismissed? I don't understand how the settlement agreement somehow, and any issues regarding that, was a proper dismissal of a forfeiture claim. I'm not sure that I completely understand the question, but I will say that we have a special situation here in that the headman had a defense to forfeiture, which was pleaded. So they were forfeiture of claimants entitled to a trial by jury of the resolution of their issue. This does not get reached by the trial court. The trial court moots that by giving a judgment that favors all of the judgment creditors, but attaches to it a requirement that nowhere appears that they're supposed to be sharing. That agreement was never reached. And of course, if you think it has, then of course you would move the claim that we made in our pleadings. And the jury trial that we never got. All right. All right. Thank you. We'll hear from the government. Mr. Raymond. Good morning, your honors. And may it please the court. Speak right up, counsel. Thank you. Good morning, your honors. May it please the court. There you go. All right. Thank you. Samuel Raymond from the government. Your honors, respectfully, I'd like to begin with the Levin's claim. The Levin's are here for the third time before this court. They are seeking a disproportionate windfall with respect to their judgment against the government of Iran. They're seeking 100 cents on the dollar, which is clear in their briefs. The other judgment creditors have agreed to a pro rata share of the forfeiture sum obtained in this case, which, as is clear in the settlement that is described in the settlement, will not be, not necessarily be, Well, the Levin's aren't part of the settlement because they were late to the dance. That's right, your honor. And I don't mean to diminish that in any way. It was just an untimeliness situation. But their assertion is that they've perfected their rights as set forth in the judgment that they've obtained by filing a writ. And so, therefore, it's attached to anything that the Republic of Iran or its agencies or instrumentalities under the realms of its statutes would have been available for seizure. What's your answer to that? Thank you, your honor. This court has rejected their standing to bring a forfeiture claim. It rejected the Levin's ability to bring a forfeiture claim back in 2019 when it affirmed the district court for their lack of compliance with Supplemental Rule G. OK. So it goes back to then, back from their ability to actually bring the forfeiture proceeding because of their failure to file the notices required by the statute. They made an argument under the TRIA that there was an exception. And that panel rejected that argument because we said that they sought to take it too far. Yes, your honor. And I think that's right. It's their notwithstanding language that became the crux of their argument. Yes, your honor. That issue was specifically briefed to this court, that the notwithstanding language preempted Supplemental Rule G. And the court denied that or rejected that argument and held that Supplemental Rule G still bound the Levin's in this forfeiture action. And so, Judge Bianco, your questions to both the Levin's and to the Hegna's, I think, are exactly right. This is a forfeiture claim. This is not some other action. The government moved to dismiss Assa's claim in the forfeiture. And this court has already held that the Levin's and the Hegna's do not have a claim in that forfeiture. To the extent they are arguing that the TRIA or some other set of laws allows them or provides statutory standing, there is simply no basis in this court's prior decisions. This court is plain in, for example, combio exacto, that in order to have statutory standing in a forfeiture, the claimant must file a verified claim within the designated time period. Similar language in this court's decision in United States v. Technodyne, 753 F. 3, 368, that in order to claim an interest in seized property, not only must a litigant have some sort of interest, they also have to assert that interest in the property in the manner set forth in the supplemental rules. So there is no decision that the government is aware of where the court has allowed statutory standing other than with compliance with the supplemental rules. Not only did the Levin's not comply with the supplemental rules, in fact, this court has already held that they didn't comply with the statutory, with the supplemental rules back in the 2019 decision. So by definition, the Levin's do not have a claim in this action. They do not have statutory standing to oppose what the government requested of Judge Preska and which she granted, which was dismissal of Asa's claim. And they can't be heard now in this forfeiture action to be heard on any other set of rules. They're simply trying to relitigate the precise issues previously briefed before this court. And, Your Honors, with respect to the timeline and some of the questions, some of the issues raised by the Levin's, I think they described that their wit was perfected before sometime in 2016. That was before then-Judge Forrest was moving this case towards trial. And those issues could have been, some of those issues were, in a sense, raised by the Levin's then. And one would have thought that if they thought they had a prior claim, they might have been there. That's right, Your Honor. And there's no basis, there's no legal basis that at this late stage, after the judgment in favor of the judgment creditors was affirmed by this court. I know they take exception to our determination at Kirchbaum, say that it was wrong, but weren't there to tell us that, I guess. Yes, Your Honor. And I think there's just no basis in the law that at this late stage, after the court has affirmed the judgment in favor of the judgment creditors, that a third party can come in with some separate set of law that they had the opportunity. And they're pretty plain about this. They could have brought some form of relief. You know, I went back through the docket. Judge Forrest offered them the chance to consolidate before the judgment creditor trial in 2017. They turned that down. They can't be heard at this late stage as the judgment creditors are finally seeking to enforce the judgment that this court already affirmed. So I think- How does the relation back doctrine play in here? It's rather unusual. I mean, does this then mean that once the government participates, that they get the benefit back to the time of the actual terrorist acts? Your Honor, I think, first of all, I don't think the court has to reach that issue. Because I think that it's pretty clear the Levins don't have standing. In order for this court to reach that issue, you first have to find that the Levins or the Haginas have standing. Then you'd have to say that ASA, again, the next step is that ASA, its rights were extinguished. That was the holding of the district court affirmed by this court in Kirshenbaum. You'd have to say that in some way, you can vacate that judgment. Again, I know of no law that says that they can do that. Only then to reach the merits issue. All right. Your Honor, I'm happy to answer any other questions. Happy to discuss the Haginas claim. What about the second codicil issue here? Your Honor, I think the first codicil is somewhat clear on its face. It says that the Haginas, who are parties, and I've heard Mr. DuPont, I don't think there's a debate or dispute that that's his signature on behalf of his clients. It says that after that, the Haginas can't take a position that is adverse to the United States in this litigation, and that's what they're doing right now. With their claim, putting aside the second codicil, the first- This issue, the second codicil, clearly is contrary to the interests of the United States, which brokers a pro rata distribution of the proceeds of the ultimate sale and or distribution,  That's right, Your Honor. and the other associated properties spread around, and any other sums accumulated during the management of the property over these now five or six years. That's right, Your Honor. This is adverse, undeniably adverse to the government's interest. Putting aside the second codicil, the first codicil is clear on its face that it can be enforced by the court, which is what Judge Prescott did in this case, holding that the Haginas are acting in a position adverse, the litigation adverse to the positions taken by the government here. All right. Thank you, Mr. Raymond. Thank you very much. We'll hear from Ms. Smith first. Thank you, Your Honors. It's crucially important that the panel understand- Ms. Smith, forgive me, I have tinnitus, so yell at me. Yeah. As if you were scolding someone. Me too. So it's crucially important that the panel understand that we are not seeking a claim in forfeiture and that what this panel ruled or this court ruled on before had to do with forfeiture and not the Levin's TRIA claim. That claim is pending in the district court right now as a separate action. Our 1610C-2016-17 writ was attached to those assets, which are the in rim- In the 2019 decision, we determined that section 201's notwithstanding clause did not Did we address the fact that there's no TRIA exception? So, Your Honor, what the court did then was say that the government in a forfeiture action, TRIA doesn't prevent the government from going forward with a forfeiture action and excluding a claimant in forfeiture. This panel did not deal with a competing TRIA claim, which is- That a TRIA claim is not superior to a forfeiture claim once you get the two actions pending and you get that issue resolved. This court did not resolve that. And this would be a terrible way to resolve that sort of by a back door if this court is going to hold that forfeiture supersedes TRIA. This is not the way to do it. That was not briefed in the district court. That was not an issue in the district court. That was forfeiture. Please, we're talking about TRIA and a TRIA- In the Smith case, we said we find no conflict between TRIA and a forfeiture law required. And you were dealing with the President of the United States, which TRIA specifically addresses in the statutory language of TRIA. Smith does not deal with a judgment creditor's right under TRIA to supersede the government's forfeiture actions. It does not. But that would be, then it's a race to the courthouse by thousands of creditors, notwithstanding the fact that the government seeks to do the same, do something for all of those creditors. I mean, that's your problem here. A, you are late in getting on into the government situation. And B, you'd like to be number one. Well, you're no different than several thousand other people. Just to be fair, we always wanted to come in. It's ironic. We begged the government to let us come in for a pro rata share. And the government said, you can't come in. Well, because you had timeliness problems. We had a timeliness problem. To be fair, Ms. Smith, you've been on this case a long time. I mean, your claim was untimely. In 2008. Yes, it was. Yes, in 2008. We didn't realize that the forfeiture action even existed. And so we missed the 60-day window. We did. But we were entitled to file a separate TRIA action, just like all the other judgment creditors did. And they followed it all the way through to judgment. The Kirshenbaum judgment creditors didn't just say, oh, we'll go along with the government. So you want us to hold that you can ignore all the timing requirements under the forfeiture laws by simply bringing a TRIA action? Is that what you're saying? No, the TRIA victims, the TRIA judgment creditors are always entitled to bring their own actions. They do not have to rely on the forfeiture. They don't. They have a right to do that. And to be very candid, in many cases, we've been more successful faster than the government, where 15 years later, I've actually collected some of the money for the victims, my clients, for the victims of the terrorist acts. So yes, it should be an overarching system. I agree with you, Your Honor. This race to the courthouse is unseemly. But I was forced to exercise our rights for the 11th when I was cut out of forfeiture. I was forced to exercise our rights under TRIA to do our own action. And believe me, I've asked to be voted back on the island as often as yesterday. So it's a question of zero for the 11th, nothing, or do you uphold their TRIA rights and send us back to the district court and say, you jumped too fast. You really need to sort out the priorities. And you know what sometimes happens then? Everybody comes together, just like that settlement agreement with everybody else. Thank you, Your Honor. Mr. Dupont, you have one minute. Thank you, Your Honor. I think one of the things that I would like to make absolutely clear, we have not, on this record, done anything else but to reach out for property that is not subject to forfeiture. That is un-corporate. These are the rents or interest in property which is flowing from the building. We understand the concept of an interest in property such as rents. This is income, that income not tainted in any way. That is clean cash and should be available to anyone who has a claim under TRIA or any other claim they may want to make to. So basically, to spend too much time on an agreement, which has never been completed, doesn't really do it for me. And we're working hard to get at assets of Iran, not to just simply impose some fines or things of that nature. We're working hard to get results. For victims of terrorism. All right. Thank you, Mr. DuPont. Thank you to all sides for a reserved decision. Have a good day. Thank you, Your Honor. The question that's being argued today is Sudroba and Saudi Company et al. versus Riyad Bazzi and Suad Bazzi. All right. I see we have Mr. Ford. You can begin whenever you're ready. You reserve two minutes for rebuttal. Thank you, Your Honors. May it please the Court. I'm Adam Ford on behalf of Appellant SBR. Your Honors, this appeal, I think, really hinges upon one question. But it's a question that I think has profound implications for our country's immigration laws. And the question that I think really decides this case is, can an immigrant, a person attempting to obtain naturalized U.S. citizenship in our country, do so without any intent to stay here? Without any intent to make America his or her home? And the District Court, we think, committed error by finding that that was possible. And here's why we're requesting a reversal of that. First off, with respect to the immigration law, and I'm gonna get into the statutory language in a moment, but I think the laws have to be read in context, right? Within sort of, what are the policy goals? What are we trying to do with our immigration laws? And without getting on my soapbox, we're a nation of immigrants, right? But what type of immigrants? The type of immigrants that wanna come here and make a better life for themselves, for their family, for their children, for their parents, wanna positively contribute to our great nation, those are the types of immigrants that we are. And our laws, of course, are written to encourage those type of people to come here. And so, now, it's with that background that we look at the actual statutory language in terms of how one becomes a naturalized U.S. citizen, and that's found in 8 CFR 316.2 and 5. And Subsection 2 sets forth the requirements for becoming a naturalized citizen. And I think four or five of them deal with the residency requirement. You have to be a resident here. You have to reside here continuously for five years. You have to reside here. That's a mandatory feature, correct? Yeah, absolutely. You have to reside. You have to reside. And why does that amount to an intention  After all, somebody who is a Californian who's arrested in New York and spends years in a New York prison still has domicile in California, even though they're required to stay in New York. Why not apply the same principle here? I grant you there's an irony here. You want to be a U.S. citizen. You want to live someplace else. But that's a requirement that you be here. How can that requirement establish your intention? Well, because the easy answer is because Congress has said so. And Congress has said so. You could correct me. To be a permanent resident, you have to be here a certain amount of time. But I don't think there's a particular requirement that you say, I'm intending to stay after I'm a citizen or am I missing something? Respectfully, your honor. If you apply that, wouldn't there be some constitutional difficulties? Once someone becomes a citizen, they're not free to leave the country and or establish a domicile elsewhere? No, of course. So on day two, I become a United States citizen on September 1st, 2022. Can I move to Canada on September 2nd and establish a domicile there? You can. You can, but you can. So it's a question of intention. Isn't that the case? Just answer my question. Is it a question of intention? It is a question of intention after you've become a U.S. citizen the day after when you decide. Don't fight back with that, counsel. I'm not trying to. On September 1st, I became a United States citizen. On September 2nd, I decided to move to Canada and live there and establish my domicile there. Can I do that? Under the law, you may. However, what Congress has said in subsection 5, which is the definition, it's the definition of residence, right? And the way they define residence is they say, by your domicile. I know there's a comma. I'm going to get to that. I'm going to get to that. I'll get to all of this. But Congress, embedded in the actual statute, the requirement of residence, your residence is your domicile, and your residence must be in the United States. Sure, but residence is a question of intention, as is domicile. Yes. Is it not? Residence is not a question of intention. Domicile is a question of intention. Well, I generally intend to reside in Geneseo, New York, and I'm domiciled there, too. Because I'm in control of my life. But in any event, you still haven't addressed the question. If I decide to move and make my domicile elsewhere, outside the United States, there's nothing that precludes me from doing that the day after I become a citizen. Yes, but this case, we're talking about the day of, right? Because what we're saying, what the argument is, on the day that an immigrant becomes a naturalized U.S. citizen, Congress has determined that their domicile- Fair enough. Is in the United States. This was before you- It must be. Let's go, let's talk with facts here. They became citizens before this action was commenced. Is that your case? That's right, July 2018. And the action was commenced in September? Correct. So two months later? Yes. All right. They're capable of changing their domicile in two months, are they not? Absolutely. Okay. And the district court made findings that their intention was to have Lebanon be their domicile. The problem was that what the district court found was that they were never domiciled in New York, even on the day that they became citizens. Well, that might be a problem with their citizenship, but it's not a problem with their domicile, is it? Yeah, but it's a problem with everything. If while they were applying for citizenship- So a requirement for citizenship then becomes a cast iron determination of domicile. That is what Congress has written in the statute. That's not my argument. Maybe we might disagree with you. So the question is, how far does that requirement reach? Is that it? That's what we have to decide, right? I'm not certain I understand that question. We have to decide whether you're right about what the implications of Congress's expression with regard to where someone has to reside at the time that they become a citizen. I would phrase it not as me, but I would phrase it as what the court has to decide